NATIONAL LABOR RELATIONS
BOARD, Petitioner,

v.

R. L. SWEET LUMBER COMPANY,
Respondent,

and

Standard Homes Company, Intervenor.

No. 74–1065.

United States Court of Appeals,
Tenth Circuit.

Submitted Sept. 13, 1974.

Decided May 13, 1975.

Paul J. Spielberg, Atty., National Labor Relations Board (Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, National Labor Relations Board, on the brief), for petitioner.

Charles E. Hoffhaus, Kansas City, Mo. (Hillix, Brewer & Myers, Kansas City, Mo., on the brief), for respondent.

George A. Lowe, Olathe, Kan., on the brief, for intervenor.

Before HOLLOWAY and McWIL-LIAMS, Circuit Judges, and CHRISTENSEN, District Judge.*

HOLLOWAY, Circuit Judge.

The petitioner, National Labor Relations Board, seeks enforcement of its decision and order that Sweet Lumber Company, the respondent, and Standard Homes Company, the intervenor, cease recognition of Teamsters Local 541 as bargaining agent of certain employees primarily engaged in the prefabrication and assembly of homes at the Standard Homes plant in Olathe, Kansas, and bargain collectively with Carpenters' District Council of Kansas City and Vicinity, AFL–CIO, as the representative of the same employees.

The Board adopted the findings, decision and proposed order of the Administrative Law Judge. 207 NLRB No. 89. It thereby determined that Sweet Lumber—acting by and through its alter ego, Standard Homes—had violated § 8(a)(1), (2), (3) and (5) of the National Labor Relations Act, 29 U.S.C.A. § 158(a)(1), (2), (3) and (5), in that (R. 879–80):

1. Sweet Lumber, by and through Standard Homes, rendered unlawful assistance and support to the Teamsters in violation of § 8(a)(1) and (2).

2. Sweet Lumber, by and through Standard Homes, enforced the provisions of the union security agreement of the Teamster contract against certain employees at Standard Homes' Olathe plant, thereby encouraging membership in the Teamsters and discouraging membership in the Carpenters, in violation of § 8(a)(1) and (3).

3. Sweet Lumber, by and through Standard Homes, refused to bargain collectively with the Carpenters as the exclusive representative of certain employees at Standard Homes' Olathe plant and unilaterally changed the terms and conditions of employment of said employees, in violation of § 8(a)(1) and (5).

Respondent and intervenor challenge enforcement of the Board's decision and order, arguing principally that: (1) the charge of unfair labor practices was time-barred by § 10(b) of the Act, 29 U.S.C.A. § 160(b); and (2) the evidence is insufficient to support the Board's findings of unfair labor practices. We must disagree with the respondent and intervenor, and grant enforcement.

Before treating the issues we will outline the factual background. As we do so, it is convenient to focus on dates in view of the time bar issue raised under § 10(b). Since the unfair labor practices charge was filed on August 18, 1972, the crucial date is February 19, 1972. Charges of unfair labor practices occurring before that date are barred, while those occurring on or after that date are timely.

*The factual background*

Sweet Lumber is engaged in the wholesale and retail sale of lumber and related products. Its principal office and lumberyard is, and has been since 1952, located at 4400 Roe Boulevard, Kansas City, Kansas. Mrs. R. L. Sweet has been president of Sweet Lumber since the death of Mr. Sweet in 1958. Along with the sale of lumber and other building products, Sweet Lumber has manufactured and sold millwork such as doors, windows and room dividers, and also single-package prefabricated homes. Through October, 1971, the prefab home manufacturing activity was carried on by the Standard Homes Division of Sweet Lumber and through February, 1972, this occurred at the Roe Boulevard location.

At all times pertinent to this case the employees at the Roe Boulevard yard have been represented by two unions. Warehouse and yard employees, including lumber handlers, truckdrivers, loaders, forklift operators and stockmen, have been represented by Teamsters Local 541. Other employees engaged in the manufacturing process, including millmen and prefab home assemblers, have been represented by Carpenters Local 1635.

* Of the District of Utah, sitting by designation.

In 1971 the directors of Sweet Lumber determined that the Roe Boulevard location was no longer adequate to carry on all of the company's activities, particularly the manufacture of prefab homes. At a directors meeting in June, 1971, it was decided to move the prefab homes operation to another location. In late 1971 land was purchased and construction of a new plant began at Olathe, Kansas, some 19 miles from the Roe Boulevard location.[1]

The directors also decided to incorporate separately the prefab home operation. They changed the name of Construction Loan Company, an existing corporation of which Mrs. Sweet was also president, to Standard Homes Company. Mrs. Sweet remained president of the newly named company. Mrs. Sweet testified that the incorporation of Standard Homes was not related to the decision to move to Olathe (R. 382). Respondent and intervenor also stress the fact that Standard Homes is a Delaware Corporation while Sweet Lumber is a Missouri Corporation in challenging the finding that Standard Homes and Sweet Lumber were a single employer (R. 863), and the finding that the Olathe prefab operation was an accretion to the Roe Boulevard prefab unit, represented by the Carpenters union (R. 865).

After the separate incorporation of Standard Homes, on October 31, 1971, the production of prefab homes continued by the same manufacturing processes at the Roe Boulevard plant. An arrangement was arrived at whereby Sweet Lumber sold its prefab homes to Standard Homes for a price that included the value of the materials and a fixed labor cost for each unit. Fixed assets and various items of property of Standard Homes Division were sold at the book value by Sweet Lumber to Standard Homes Company on November 1, 1971. Although a separate office was temporarily set up for Standard Homes Company office employees at Roe Boulevard and some office employees were paid on Standard Homes Company checks at least in January and February of 1972, the prefab production employees continued to be employed and paid by Sweet Lumber.

In August, 1971, a "Staff Bulletin" was placed in the timecard slots of the employees at Roe Boulevard relating the news of the planned move to Olathe. The bulletin stated that the new plant would be occupied by "Standard Homes Company, a division of Sweet Lumber" and that January, 1972, was the target date for completion (Ex. 4, R. 795).

Preparations for occupying the Olathe plant began in January, 1972. Early that month, Frank Woodbury and Charles Roberts went out to the Olathe site to coordinate completion of the plant with the general contractor. Lumber also began arriving that month, and four employees were hired to unload the initial lumber deliveries and to build racks and other facilities. One of these men, Kline, had been a member of the Teamsters unit at Roe Boulevard and became a foreman at Olathe. The other three—Streeter, Nicely and Brown—were new employees.

On January 24, 1972, Aubrey Williamson, a business agent of Teamsters Local 541, visited Olathe and obtained signed authorization cards from Kline, Streeter, Nicely and Brown (R. 257–258, 275, 855). On February 4, Williamson met with Eugene Smith, then the vice-president of Standard Homes, and Charles Hoffhaus, attorney for Sweet Lumber, and presented the signed authorization cards. After verifying the signatures, Smith and Hoffhaus agreed to bargain, and on February 11, Standard Homes and Teamsters Local 541 executed a contract running from February 7, 1972, to February 2, 1975, with a provision for automatic renewal (R. 260, 669, 855). The contract

---

1. At Olathe the land and the building are owned by R. L. Sweet Investment Company and all of the stock in that company is held in trust for Mrs. Sweet and her two sons-in-law (R. 352). Standard Homes paid a rental to Sweet Investment Company for use of the land and building (R. 405).

wage scale provided for a minimum hourly wage of $3.50 per hour. By its terms, the contract covered "all production and maintenance employees at the Employer's Olathe, Kansas plant including truck drivers" and contained a union security clause requiring all employees to join Teamsters Local 541 within 31 days after beginning employment.

At the time that the contract was signed, only four men (Kline, Streeter, Nicely and Brown) were performing work that could be covered by its terms. As mentioned, their work consisted of unloading lumber and building racks and other facilities. No production was being done at Olathe at this time,[2] and Smith testified that at the time he signed the contract, he knew that he would have 12 to 13 more non-office employees working at Olathe shortly.

In mid-February, Smith began interviewing Sweet Lumber employees at the Roe Boulevard plant to determine whether they would accept employment at Olathe. Among these were four men who were working in the prefab homes operation at Roe Boulevard and were members of Carpenters Local 1635. These four—Coffelt, Schaffer, Fisher and Papineau—all eventually accepted employment at Olathe. Except for Coffelt, who was on vacation and whom Smith went to see at home, they were interviewed in Smith's office at the Roe Boulevard plant. Smith told all four men that there would be only one union at Olathe—the Teamsters.[3]

The men testified that they began work at Olathe sometime between February 23 and February 29, but that no production work on prefab homes took place before February 29 and that work done prior to that date was maintenance work to prepare for production.[4] Once production started, they testified that they did the same job as at Roe Boulevard with the same tools they had used there. None of these four joined the Teamsters immediately on arrival at Olathe, but did join Teamsters Local 541 eventually.[5]

On February 20, 1972, before the prefab workers began production at Olathe, a Carpenters' representative—Harding—questioned Mr. Hatcher, vice-president of Sweet Lumber that handled union matters, about the transfer of employees to Olathe. (R. 31–32). Hatcher informed Harding at that time that the "facility out there was a wholly owned Delaware corporation and was not part of Sweet Company, there was nothing to discuss." (R. 31). Harding indicated at that time to Hatcher that they would "process the thing through the provisions of our contract that refer to grievance procedure." (R. 31). This was found to be a refusal by Sweet Lumber to bargain with the Carpenters union (R. 871), and it was found also that the refusal to bargain

2. Vice-President Smith was still officing at Roe Boulevard and the office employees of Standard Homes were also still at Roe Boulevard.

3. While all four were initially offered a wage rate of $3.75 per hour under the Teamsters contract, they were all eventually paid at a "leadman" rate of $4.50 or higher. At that time, all four had been making $5.06½ per hour at Roe Boulevard under the Carpenters' contract. Fisher, in fact, was paid his Roe Boulevard wage for his first two days at Olathe, which were not counted as "official" days at work there. Thereafter, he was paid at the lower wage of $4.50 per hour.

4. The Board found that production began at Olathe on February 29, 1972. See note 8, infra.

5. Coffelt testified that Kline, who at this time was working as a foreman at Olathe, referred him to a Teamsters agent, and Schaffer similarly testified that either Kline or another foreman had referred him to the agent. Both testified that they had wanted to wait to see what the Carpenters were going to do before joining the Teamsters. Papineau stated that when he indicated to Kline his reluctance to join the Teamsters, remarking that Kansas was a right to work state, Kline had told him that he could be transferred to a plant owned by respondent in Missouri where there was no right to work law. Finally, Fisher testified that he had had an argument with Smith over paying the Teamsters $100 dollar initiation fee and that Smith had indicated that the company might be able to pay it for him if Fisher would not pay it. Fisher, however, refused and paid the fee himself.

continued by two other acts in March and April, 1972 (R. 872).

As stated, on August 18, 1972, the charge of unfair labor practices—essentially refusing to bargain with the Carpenters union concerning the Olathe operation and illegal support of the Teamsters union—was filed which culminated in the challenged order. We turn now to respondent's grounds for opposing enforcement of the order.

## I

### Whether the charge of unfair labor practices was time barred by § 10(b)

Respondent argues that the unfair labor practices alleged by the charge are time barred by § 10(b) of the Act, 29 U.S.C.A. § 160(b). It maintains that all acts involved herein depend on the legitimacy of the Teamsters contract executed on February 11, 1972, which is the significant event for limitations purposes. It says that since the charge in this case was not filed until August 18, 1972, acts occurring prior to February 19, 1972, would be barred under the six-month limitation provision of § 10(b), and that all charges of violations are thus untimely.

The amended complaint (see R. 827) had challenged the validity of the February 11 contract, but the Board found that § 10(b) foreclosed consideration of whether the recognition was lawful (R. 866–67) and on this basis refused to set aside the bargaining agreement. This ruling is not challenged. The Board went on to determine, however, that the bar did not apply to the allegation that the Teamsters contract was unlawfully applied after February 18 against Carpenters members from Roe Boulevard who had begun working at Olathe.

Respondent argues that, as a matter of law, the § 10(b) bar must be given effect against all the alleged unfair practices, relying principally on Local Lodge No. 1424, National Ass'n of Machinists, AFL–CIO v. NLRB, 362 U.S. 411, 80 S.Ct. 822, 4 L.Ed.2d 832 (the *Bryan* case) and NLRB v. Serv-All Co., 491 F.2d 1273 (10th Cir.). We cannot, however, agree that either *Bryan* or *Serv-All* dictate a denial of enforcement.

In *Bryan,* the employer had entered into a collective bargaining agreement with a union that did not represent a majority of the employees at the time that the original agreement was executed. Charges were filed with the Board 10 and 12 months after the execution of the agreement. Conceding to the Court that the charges as to the contract's execution were barred by § 10(b), the Board nevertheless argued that continued enforcement by the employer and the union was a separate and continuing unfair labor practice not protected by § 10(b).

Disagreeing, the Court noted that the union security clause and its enforcement, standing alone, were wholly innocent and could not be charged as an unfair labor practice except through reliance on the illegality of the execution of the original agreement. Under such circumstances, and since the execution of the agreement was over six months prior to the filing of the charges, the Court held that § 10(b) barred reference to the illegal nature of the agreement's execution and thus its illegality could not cast a shadow across the agreement's subsequent enforcement.

We should note, however, the limitations stated by the Court to its holding in *Bryan,* 362 U.S. at 422, 423, 80 S.Ct. at 829:

> [W]e need not go beyond saying that a finding of violation which is inescapably grounded on events predating the limitations period is directly at odds with the purposes of the § 10(b) proviso.

. . . . .

In any real sense, then, the complaints in this case are 'based upon' the unlawful execution of the agreement, for its enforcement, though continuing, is a continuing *violation* solely by reason of circumstances existing only at the date of execution.

The Court pointed out that earlier events back of the § 10(b) period may be utilized to shed light on the true character of matters occurring within the limitations period, but concluded that the situation in *Bryan* was one "where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice." Id. at 416–17, 80 S.Ct. at 827.

Respondent contends that here, as in *Bryan,* the date of the contract's execution is controlling for § 10(b) purposes. The Teamsters contract, respondent points out, on its face covers "all production and maintenance employees" at Olathe (¶ 2, R. 669). Necessarily then, says the respondent, if the Carpenters rights were violated, this occurred at the time that the contract was signed. And if the contract's validity is beyond scrutiny, charges as to its subsequent application to the Carpenters are also barred.

We do not feel that *Bryan* established a black and white rule in all cases where a contract's execution is related to the unfair labor practice charges that would bar such charges where the contract's execution was beyond the six-month period.[6] Indeed, the Court referred to the Board's attitude lending support to its views, comparing cases held timely by the Board "where evidence as to events during the barred period was used to illuminate current conduct claimed in itself to be an unfair labor practice . . . " with others held untimely " . . . where the gravamen of the unfair labor practice complained of lay in a fact or event occurring during the barred period." *Bryan,* supra at 419–20, 80 S.Ct. at 828. And the Court cited Board cases holding charges untimely where " . . . the evidence in fact

marshalled from within the six-month period is not substantial, and the merit of the allegations in the complaint is shown largely by reliance on the earlier events." Id. at 421, 80 S.Ct. at 829. The Court stated, id. at 422, 80 S.Ct. at 829:

> However, we express no view on the problem raised by such cases, for here we need not go beyond saying that a finding of violation which is inescapably grounded on events predating the limitations period is directly at odds with the purposes of the § 10(b) proviso.

■ We feel that we do not have a case where the contract execution date in itself is controlling, and instead must consider the circumstances surrounding several actions and events to determine when the gravamen of the unlawful practices charged occurred. In determining this, we believe it is important to view the facts in light of the Board's findings, which we sustain.[7] We must focus on whether, in substance, the unfair labor practices of refusal to bargain with the Carpenters union and illegal support of the Teamsters, and the like, occurred before or after the critical date—February 19, 1972.

As stated, the Sweet Lumber contract with the Teamsters was executed on February 11. However, despite the separate incorporation of Standard Homes and the subsequent move of prefabrication operations to Olathe, it was found that Standard Homes and respondent remained a single employer, Standard Homes being the alter ego of Sweet Lumber. Hence all prefabrication employees whether working at Roe Boulevard or Olathe, continued to be represented by the Carpenters. The Board

---

**6.** The Court made clear that *Bryan* was a case "where conduct occurring within the limitations period can be charged to be an unfair labor practice only through reliance on an earlier unfair labor practice," *Bryan,* supra at 416–17, 80 S.Ct. at 827—there the unfair labor practice being agreement with a union not representing a majority at the time of original execution of the contract.

**7.** The respondent and intervenor vigorously challenge the Board's findings. However for reasons stated later, we conclude that there is substantial evidence to support the findings and sustain them.

also found that at the time of the execution of the Teamsters contract, the only employees working at Olathe were four engaged primarily in unloading lumber, etc. (R. 868), which was not prefab work. In fact, the Board found that no prefab production began at Olathe until on or after February 21 (R. 870). See note 8, infra.

The situation up to February 21, therefore, was that prefabrication production workers were still working at Roe Boulevard under the Carpenters contract and had not yet begun work at Olathe, while four non-prefab production workers—one of whom was a former Teamsters 541 member—had gained recognition of the Teamsters as their bargaining agent.

It was found that the Teamsters contract was enforced at Olathe in violation of § 8(a)(1), (2) and (3) (the interference; domination and support; and encouragement of membership unfair labor practices), and that the Teamsters union was unlawfully assisted, at times occurring within the § 10(b) period (R. 868). In fact, not until on or about February 21 were any of the Carpenters prefab workers working at Olathe (R. 868, 870; e. g. R. 108).[8] It was also found that the Teamsters contract, with its lower wage rates and different benefits, was applied to the prefab and assembly workers upon their employment at Olathe (R. 868; see R. 221–38). Such acts in applying the Teamsters contract thus come within the § 10(b) period.

We do note, in connection with the finding as to enforcement by intervenor of the Teamsters contract's union security clause, the finding that Standard Homes' vice-president Smith advised Coffelt on about February 17, and Fisher and Papineau a few days later, that the employees at Olathe would be represented by one union—the Teamsters (R. 868). However, it was found that after the employees had begun work at Olathe,

further efforts were made by respondent to have the employees join the Teamsters (R. 869). These acts included a remark by a Standard Homes foreman that Papineau could be transferred to Missouri (where there was no right to work law) when Papineau raised a right to work law objection after the foreman spoke to him about joining the Teamsters union (R. 869; see note 5, supra). And there was also discussion within the § 10(b) period of possible payment by Standard Homes of the Teamsters' initiation fee for Fisher, which offer was declined. (R. 869; see note 5, supra.)

And, as stated earlier, it was found that on February 20, 1972, respondent refused to bargain with the Carpenters concerning the Olathe operation, and that the refusal was repeated by two later acts in March and April, 1972. (R. 871–72).

In view of these findings, we cannot agree that NLRB v. Serv-All Co., 491 F.2d 1273 (10th Cir.) dictates a denial of enforcement. There the employer indicated by several acts outside the § 10(b) period that it would not abide by a new contract made by a multi-employer bargaining group and the union. The Board held the charges timely on the ground that the initial refusal to bargain recurred within the six-month period. This Court held that the record did not support a finding that the refusal to bargain recurred within the period, and further rejected the views of the Board as faulty in law in applying the recurring violation theory. Here, we do not feel we have a recurring violation question as in Serv-All, but rather a problem whether conduct which itself is the gravamen of the unfair labor practices charged occurred within the § 10(b) period. Bryan, supra 362 U.S. at 419–20, 80 S.Ct. 822.

While the case is not free from doubt, we are persuaded that in these circumstances the contract execution date is not controlling. We conclude that the

---

·8. The Board found that the first prefab home package was produced on February 29 at the Standard Homes Olathe plant (R. 856), and the

findings stated that production began on February 29, 1972 (R. ·861).

substantial active conduct adversely affecting the Carpenters union and those whom it was entitled to represent, and constituting the unfair labor practices found, fell within the six month period. See Shumate v. NLRB, 452 F.2d 717, 719–20 (4th Cir.); Local Union No. 167, Progressive Mine Workers of America v. NLRB, 422 F.2d 538, 542–43 (7th Cir.); NLRB v. Plumbers & Pipe Fitters Local Union 214, 298 F.2d 427 (7th Cir.); cf. NLRB v. New Mexico District Council of Carpenters, 454 F.2d 1116, 1119–20 (10th Cir.). Accordingly we hold that the charges were not barred by § 10(b) as to the unfair labor practices found.

## II

*Whether there is substantial evidence supporting the Board's findings and order*

■ As stated the Board adopted the Administrative Law Judge's findings of unfair labor practices, and respondent and intervenor vigorously challenge the findings. In reviewing them we are enjoined by Universal Camera Corp. v. NLRB, 340 U.S. 474, 487–88, 71 S.Ct. 456, 95 L.Ed. 456, to review the record as a whole, taking into consideration not only evidence supporting the findings, but contradictory and conflicting evidence as well. However, we may not ignore the Board's expertise or displace its findings between two fairly conflicting views, even though we would have made a different choice had the matter been before us *de novo.* Id. at 488, 71 S.Ct. 456. If such review of the record as a whole reveals substantial evidence supporting the findings, they must not be disturbed. Id. at 485, 71 S.Ct. 456.

a. *The finding that Sweet Lumber and Standard Homes were a single employer*

■ The Board found that Sweet Lumber and Standard Homes were a single employer under § 2(2) of the Act, 29 U.S.C.A. § 152(2). Such a view of separate legal entities may be made when necessary to safeguard statutory rights. See NLRB v. Gibraltar Industries, Inc.,

307 F.2d 428, 431 (4th Cir.). The controlling criteria are the interrelation of relations, common management, centralized control of labor operations, and common ownership. See Radio & Television Broadcast Technicians Local Union 1264, IBEW v. Broadcast Service of Mobile, Inc., 380 U.S. 255, 85 S.Ct. 876, 13 L.Ed.2d 789; NLRB v. Jordan Bus Co., 380 F.2d 219, 221 (10th Cir.). The determination is essentially a factual one and will not be set aside unless clearly erroneous. See NLRB v. M. P. Building Corp., 411 F.2d 567, 568 (5th Cir.); NLRB v. A. E. Nettleton Co., 241 F.2d 130 (2d Cir.).

■ On consideration of the record as a whole and the arguments by respondent and intervenor, we are satisfied that the findings are supported by substantial evidence. The challenges to the findings are essentially premised on the stressing of conflicting evidence such as testimony by Mrs. Sweet, president of both companies, that Mr. Smith was in complete control of important matters at Standard Homes. There were, however, conflicting admissions as to her degree of control. In any event there was substantial proof of common management as to several officers, including Mrs. Sweet who served both companies as president.

In addition, as to its operations respondent vigorously argues that Standard Homes was putting out a totally different product and using different purchasing and production methods at Olathe. Again the contention is based on portions of the proof admittedly favoring respondent, while there was conflicting proof for example, each of four Carpenters who testified stated he did essentially the same work with the same tools as he had done at Roe Boulevard.

We are satisfied that there was substantial proof as to common management, common ownership, centralized control of labor policy, and interrelation of operations. We feel the record amply supports the finding.

b. *The finding that the Standard Homes prefabrication employees are a part of or an accretion to the Carpenters Unit at Roe Boulevard*

■ The Board's finding of accretion is similar to its function of determining the appropriateness of particular units for bargaining purposes. See NLRB v. Sunset House, 415 F.2d 545, 547 (9th Cir.). The determination is one involving the Board's discretion and should not be set aside unless a reviewing court is convinced that the Board has acted in an arbitrary and capricious manner. NLRB v. Baton Rouge Waterworks Co., 417 F.2d 1065, 1067 (5th Cir.); International Union, UAW v. NLRB, 231 F.2d 237, 243 (7th Cir.).

■ The factors weighed by the Board include functional integration of the business, centralized management, similarity of working conditions, collective bargaining history, local power to hire and fire, lack of employee interchange, and geographical distance. NLRB v. Sunset House, supra at 548. The findings related to the single employer determination are obviously relevant again.

In addition, here the Board found that employees at Olathe were doing the same work with the same equipment as at Roe Boulevard; that the product was essentially the same; that employee seniority had been transferred from Roe to Olathe, at least as to vacation rights; that management of the companies was essentially the same; and that there was in fact little evidence of interchange between production employees and others at Olathe. In contesting the findings respondent again argues conflicting interpretations, saying that Olathe was obviously going to be a plant for production of mass-produced homes and that when employees were added to implement such production, they were accreted to the Olathe plant, and not to the Roe plant where such production had permanently ceased. We are not persuaded by the different emphasis. We

must agree that the Board's findings are supported by substantial proof.

■ Respondent argues further that recognition of the Carpenters as the bargaining representative of the prefab production employees would have constituted an unfair labor practice, relying on NLRB v. Hudson Berlind Corp., 494 F.2d 1200 (2d Cir.). There, however, a new facility was established consolidating two older separate facilities, each represented by a different union. The Board found no accretion and the finding was sustained. In view of the finding of no accretion and the presence of conflicting unions, the employer's bargaining with one union was viewed as a violation of its duty of neutrality. See Midwest Piping Co., 63 NLRB 1060. We view the case as inapposite since it was based on a contrary determination of no accretion.

We view the record as a whole as amply sustaining the accretion finding here.

c. *The Board's findings of violations of § 8(a)(5) and (1)*

■ Respondent argues there is insufficient evidence to support the findings of violation of § 8(a)(5) and (1), 29 U.S. C.A. § 158(a)(5) and (1), refusal to bargain and interference with employees' rights. More specifically respondent says it notified the Carpenters concerning the move to Olathe and that the union waived its right to bargain by not promptly requesting negotiations concerning the move; that the Carpenters contract with respondent was limited to the Roe Boulevard plant; that the management rights clause in the contract permitted respondent to discontinue the prefab operations without bargaining with the Carpenters union; that the Olathe employees voluntarily left the Carpenters unit at Roe Boulevard; and that there was no substantial detriment to the Carpenters.

In support of respondent's position the record does show the distribution of the August, 1971 bulletin to the Roe Boulevard employees about the new plant and

the Standard Homes move (R. 795),[9] and testimony by employee Shaffer that the move was common knowledge.

The Board found that the Carpenters union was not formally notified of the move nor offered a reasonable opportunity to bargain about the move or its consequences. And the findings stated that even if notice to employees served as formal notice to the union, the Judge disagreed that the Carpenters union was given an adequate notice of the opportunity to bargain on the matter, there being no indication in the notice that the move would result in any change in the terms and conditions of employment of Carpenters unit employees (R. 872).

We sustain the findings. The lack of formal notice to the union is supported by testimony of the business representative, Mr. Harding. Moreover the bulletin referred to a change in location, but without mention of a change in corporate status or conditions of employment (R. 795). See NLRB v. Royal Plating & Polishing Co., 350 F.2d 191, 194–95 (3d Cir.). We are not persuaded by the notice argument, since the employer must provide the union with notice of a vital change in working conditions. See NLRB v. Rapid Bindery, Inc., 293 F.2d 170, 176 (2d Cir.).[10]

Since we sustain the finding of lack of adequate notice to the Carpenters union concerning the relocation to Olathe, we are not persuaded that there was waiver by the union's failure to demand bargaining concerning the move before Harding's discussion on February 20, 1972, with Mr. Hatcher. As stated earlier, we sustain the finding that Harding then sought to discuss the transfer and that respondent refused to bargain (R. 871).

A further waiver argument is made on failure of the Carpenters union to attempt bargaining concerning the Olathe plant when the Roe Boulevard contract was renegotiated in April and May of 1972. There was no discussion by the Union concerning the Olathe employees in those negotiations. However, the failure to make such a demand in those negotiations was found not to have absolved respondent of its duty to bargain, and we sustain this determination. Any such waiver of the Union's right to bargain must be clear and unmistakable. See Murphy Diesel Co. v. NLRB, 454 F.2d 303, 306–07 (7th Cir.). We accept the determination that no waiver of the right to bargain occurred. In addition we are not persuaded by the waiver argument since it would seem futile that the Carpenters union again attempt to bargain about the Olathe plant when efforts to do so had been rebuffed three times previously (R. 874).

Respondent argues that the management rights clause in Article XIX of the 1970–1972 contract with the Carpenters gave it the right to determine what products should not be manufactured and the right to introduce new facilities (R. 632). It says that Olathe was such a new facility that the company had a right to establish and that it did not have to bargain for the right again. Here, however, application of the Teamsters contract effected substantial changes in terms and conditions of employment. As the Board's decision points out, any waiver of the right to bargain about mandatory subjects of collective bargaining must be clear and unequivocal. See Weltronic Co., 173 NLRB 235; enforced, 419 F.2d 1120 (6th Cir.). We must agree the contract did not go

**9.** The respondent points out that such distribution to all employees included Mr. Boyce, the union steward. He testified he did not see any Sweet Lumber literature distributed at Roe Boulevard about the Olathe plant (R. 175–176). This point is not resolved by the Board's findings, the Board concluding that adequate notice was not given by the bulletin in any event (R. 872).

**10.** Reliance on NLRB v. Spun-Jee Corp., 385 F.2d 379 (2d Cir.) is misplaced. The information there conveyed was informal but complete, while here the bulletin did not give information sufficient to alert the union to bargain, and thus did not constitute sufficient notice.

so far. And despite the right to introduce the new facility, there was still a duty to bargain about the effects on employees represented by the Carpenters. See NLRB v. Thompson Transport Co., 406 F.2d 698, 702–03 (10th Cir.).

 Respondent argues that the employees voluntarily left the Carpenters unit at Roe Boulevard and accepted employment at Olathe and that consequently they are not proper subjects for bargaining. We must disagree. The voluntary response by employees directly approached did not extinguish the duty to bargain, or constitute a defense to the charge of refusal to bargain with the bargaining representative. See Medo Photo Supply Corp. v. NLRB, 321 U.S. 678, 64 S.Ct. 830, 88 L.Ed. 1007.

d. *The Board's findings of violations of § 8(a)(2)(3) and (1)*

 There remain respondent's and intervenor's arguments against the findings of unlawful assistance to the Teamsters union in violation of § 8(a)(2), (3) and (1), the "domination" and "illegal support" findings. Essentially respondent argues that these charges were time barred, and were clearly erroneous since separate corporations and an utterly new and different type of industrial labor unit was involved, having no affiliation with the cabinet makers at Roe Boulevard. For reasons already stated, we must reject the time bar argument and the factual arguments about the operations at the two plants.

We have considered these objections and others advanced against the findings. We are persuaded there is substantial evidence on the record as a whole to support the findings and must sustain them.

We are satisfied that the findings of the Board are supported by substantial evidence as to the unfair labor practices found and we must reject the defense that the charges were barred by § 10(b). Accordingly the order will be enforced.