671 F.2d 11
 109 L.R.R.M. (BNA) 2593, 93 Lab.Cas. P 13,249
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
and
United Optical Workers Union Local 408, International Union
of Electrical, Radio and Machine Workers, AFL-CIO,
Intervenor,
v.
MARINE OPTICAL, INC., Respondent.
 No. 81-1541.
 United States Court of Appeals,
First Circuit.
 Argued Dec. 7, 1981.
Decided Feb. 8, 1982.
Rehearing Denied March 1, 1982.
 
 On Petition for Rehearing
 Eric Moskowitz, Atty., with whom William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, and Elliott Moore, Deputy Associate Gen. Counsel, Washington, D. C., were on brief, for petitioner.
 James M. Paulson, with whom Morgan, Brown, Kearns & Joy, Boston, Mass., was on brief, for respondent.
 Jerome Tauber, with whom I. Philip Sipser, Leonard Leibowitz, and Sipser, Weinstock, Harper, Dorn & Leibowitz, New York City, were on brief, for intervenor.
 Before COFFIN, Chief Judge, BOWNES and BREYER, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 The National Labor Relations Board (the Board) seeks enforcement of its order finding respondent Marine Optical, Inc. (the Company) in violation of sections 8(a)(1) and (5) and 8(d) of the National Labor Relations Act (the Act), 29 U.S.C. § 158(a)(1), (5) and (d). Following a hearing before an administrative law judge (ALJ), the Company was found to have violated section 8(a)(5) and (1) by withdrawing recognition from the Union[1] as the exclusive collective bargaining representative of its production employees; by refusing to apply an existing collective bargaining agreement to production employees at a facility in Brockton, Massachusetts (the Brockton facility), to which the Company had relocated; and by unilaterally changing the conditions of employment at the new facility. In addition the ALJ found the Company violated section 8(a)(1) by advising its employees at its old facility in Roslindale, Massachusetts (the Roslindale facility), that it would not recognize the Union at the Brockton facility, would not apply the existing contract in Brockton, and would change working conditions and employee benefits there. In its order the Board affirmed the rulings, findings, and conclusions of the ALJ and adopted his order with the modification that the Company's conduct also constituted a violation of section 8(d) of the Act.
 
 
 2
 The facts are essentially undisputed, the parties having entered into extensive stipulations.
 
 
 3
 The Company manufactures and sells eyeglass frames. Since 1975 when it took over operations in Roslindale from its predecessor,[2] the Company had recognized the Union as the bargaining representative of its production employees. The most recent collective bargaining agreement between the Company and the Union was effective from February 1, 1977, to February 1, 1980.
 
 
 4
 In August of 1979, during the term of the collective bargaining agreement, the Company, upon learning it could not renew its lease in Roslindale, notified the Union of its probable move to Brockton, seventeen miles away. With the Union's permission, the Company interviewed its employees to ascertain which ones desired employment at Brockton.
 
 
 5
 Subsequently, the Company reinterviewed those employees who had expressed an interest in transferring to Brockton. During the second round of interviews, the employees were told that wages, hours and benefits would be different at the new facility. Also, upon inquiry from employees, the Company indicated that it would not recognize the Union at Brockton unless a majority of the production employees at the Brockton facility desired to be represented and that it would not apply the existing collective bargaining agreement at Brockton. All of this information became known generally among the employees at the Roslindale plant.
 
 
 6
 In September 1979 the Union demanded bargaining for a contract to succeed the existing one that was scheduled to expire on February 1, 1980. The Company refused, stating that it could not recognize the Union at the Brockton facility unless a majority of the employees there indicated a desire for representation. From on or about October 5, 1979, the Company has refused to recognize the Union at the Brockton facility.
 
 
 7
 In early October 1979 the Company began gradually to move its operations from Roslindale to Brockton until the relocation was complete at the end of November 1979. The Company continued its operations during this transaction with some departments operating in Brockton and some remaining in Roslindale. There was a gradual transfer of those employees from Roslindale who had accepted employment at Brockton. Of the sixty-four employees working at Roslindale in early October, twenty-six were employed at Brockton by early December.[3]
 
 
 8
 During the transition from Roslindale to Brockton, the same management officials had overall responsibility for operations and labor relations at both locations, the manufacturing manager had responsibility for both, and one office purchased raw materials for both facilities. At the Brockton facility the Company employed most of the same supervisory personnel as had been at Roslindale, used the same machinery and equipment in the same way as it had at Roslindale, purchased raw materials from the same suppliers, had the same inventory and customers as at Roslindale, operated under the same name, maintained the same job titles and required the same type of skills from its employees as it had prior to relocating.
 
 
 9
 At the time of the move the Company and the Union were parties to a collective bargaining agreement that had been negotiated in January 1977. During these negotiations, the Company was represented by its president, Izzi, and the Union by its business manager, Rebaldo.[4] Izzi told Rebaldo that the leases on the Roslindale buildings were due to expire at the end of 1977 and that he was having difficulty getting the leases renewed because of a possible sale of the buildings. But, he said, he was continuing to negotiate with the owner and the Company "may or may not have to move." He stated that he did not have a new site in mind.
 
 
 10
 Izzi told Rebaldo he was "in a quandary" because he understood that if the Company moved and the majority of employees at the new location were new hires, there would be a legal question as to the Company's ability to recognize the Union. He then suggested that they negotiate an agreement to cover only one year. Rebaldo strongly objected to a one-year contract, stating that if Izzi insisted, the Union would demand additional terms to protect the employees, a route he preferred not to take. Rebaldo told Izzi that relocation would be "absolutely no problem," that he had been involved with other companies who moved during the term of a collective bargaining agreement and they simply took the contract along with them. Rebaldo did not request a change in the wording of the recognition clause of the agreement, which read: "The Union shall be the sole collective bargaining agency for such production employees of Employer (with certain enumerated exceptions not here pertinent) as are employed at the plants of Employer at 28 Mahler Road and 28 Lochdale Road, Roslindale, Massachusetts."
 
 
 11
 Izzi told Rebaldo that he wanted to consult with his counsel on this matter and did so. He later reported to Rebaldo that his attorney had said that in the event of a move there might be a problem but that the Company could go ahead and negotiate a three-year contract. The parties subsequently signed a three-year agreement, which, as noted above, was in effect in September 1979 when the Union demanded bargaining and during the period of relocation to Brockton.
 
 
 12
 Before determining whether the Company had a duty to bargain with the Union after relocating, the ALJ found as a preliminary matter that the bargaining unit named in the contract was not limited to the Roslindale facility. He noted first that the Company's answer to the Board's complaint admitted the allegation of the appropriate bargaining unit,[5] which contained no geographical limitation. The ALJ further found that the continuity of the Company's operations during the time of its relocation supported the conclusion that the bargaining unit remained unchanged. The Company moved its operations only seventeen miles one department at a time over a period of two months. During that time, the operations continued as an integrated whole, with production employees working at both facilities on the same products using the same equipment and doing the same work as they had done when only the Roslindale facility existed.
 
 
 13
 The Company argues that the language of the recognition clause in the contract, "for such production employees ... as are employed at the plants of Employer at 28 Mahler Road and 28 Lochdale Road, Roslindale, Massachusetts," limits the bargaining unit to those employed at Roslindale. Absent evidence that the parties intended this as a geographical limitation rather than merely a description of the physical location of the plant at the time of entering the agreement, the words themselves do not limit the unit. Los Angeles Marine Hardware Co. v. NLRB, 602 F.2d 1302, 1306-07 (9th Cir. 1979). We find nothing in the record to support an inference that the parties intended this wording to embody a geographical limitation.
 
 
 14
 The Company's contention that the Union by its conduct during the 1977 contract negotiations waived its claim to continued representation upon plant relocation is also without merit. The actions of Company president Izzi and Union representative Rebaldo show that both parties intended to defer consideration of relocation issues, since at the time the entire matter of a move was speculative. A waiver in this context must be clear and unmistakable. NLRB v. R. L. Sweet Lumber Co., 515 F.2d 785, 795 (10th Cir.), cert. denied, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975); NLRB v. Die Supply Corp., 393 F.2d 462, 467 (1st Cir. 1968). Indeed, Rebaldo's assertion that there would be no problem in taking the contract along to any new facility and his insistence on a three-year agreement manifest an intention not to waive continued representation.
 
 
 15
 In light of the Board's competence in this area, its determination of the composition of a bargaining unit is generally entitled to our deference. Air Express International Corp. v. NLRB, 659 F.2d 610, 615 (5th Cir. 1981); Universal Security Instruments, Inc. v. NLRB, 649 F.2d 247, 253 (4th Cir. 1981); NLRB v. R. L. Sweet Lumber Co., 515 F.2d at 795. The record facts as outlined herein constitute substantial evidence for the Board's conclusion that the bargaining unit described in the collective bargaining agreement survived the move from Roslindale to Brockton.
 
 
 16
 The next issue is what effect the existing contract had on the Company's duty to recognize and bargain with the Union. It is well-established that for the life of a collective bargaining agreement the status of the union as exclusive bargaining representative may not ordinarily be questioned. Pioneer Inn Associates v. NLRB, 578 F.2d 835, 838 (9th Cir. 1978); NLRB v. Sanson Hosiery Mills, Inc., 195 F.2d 350 (5th Cir.), cert. denied, 344 U.S. 863, 73 S.Ct. 103, 97 L.Ed. 669 (1952). See NLRB v. Marcus Trucking Co., 286 F.2d 583, 593 (2d Cir. 1961). This is so even if a rival union appears to have gained the support of a majority of the employees. Marcus Trucking Co., supra. The rule prohibits an employer and employees from petitioning the Board for decertification of an incumbent union. Pioneer Inn Associates, supra.
 
 
 17
 Since an employer may not petition for decertification during this contract-bar period, it follows that he may not repudiate the contract or withdraw recognition from and refuse to bargain with the Union during the term of the collective bargaining agreement. NLRB v. Burns Security Services, 406 U.S. 272, 290 n.12, 92 S.Ct. 1571, 1583 n.12, 32 L.Ed.2d 61 (1972); Osteopathic Hospitals Founders Association v. NLRB, 618 F.2d 633, 638 (10th Cir. 1980); Pioneer Inn Associates, 578 F.2d at 838. A contrary rule would permit an employer to do on its own what would have been forbidden had it petitioned the Board, i.e. question the majority status of the Union. Pioneer Inn Associates, 578 F.2d at 838-39. Thus, during the period a valid collective bargaining agreement is in effect, the Union, absent unusual circumstances not present here, enjoys a conclusive presumption of majority status. Bellwood General Hospital, Inc. v. NLRB, 627 F.2d 98, 102 (7th Cir. 1980); Osteopathic Hospitals Founders Association, supra; Pioneer Inn Associates, supra. See NLRB v. Iron Workers, 434 U.S. 335, 343 n.8, 98 S.Ct. 651, 656 n.12, 54 L.Ed.2d 586 (1978); NLRB v. Burns Security Services, 406 U.S. at 290 n.12, 92 S.Ct. at 1583 n.12 (for term of collective bargaining agreement "an employer cannot use doubt about a union's majority as a defense to a refusal-to-bargain charge.")
 
 
 18
 The Board has held that, when a company relocates its operations during the term of a collective bargaining agreement, the contract-bar principles of continued recognition and adherence to the agreement still apply, with certain modifications. In Westwood Import Company, Inc., 251 N.L.R.B. 1213 (1980), the Board reaffirmed that "an existing and effective collective bargaining agreement remains in effect following a relocation, provided operations and equipment remain substantially the same at the new location, and a substantial percentage of the employees at the old plant transfer to the new location." Id. at 1214. See Tricor Products, Inc., 239 N.L.R.B. 65 (1978). Substantial continuity in the Company's operations and in the bargaining unit reasonably implies that conditions have not significantly changed from those prevailing when the agreement was entered and supports allowing the Union the continuing benefit of the presumption of majority status.
 
 
 19
 Here, there is no dispute that the operations of the Company remained substantially the same following the relocation to Brockton. In addition, the twenty-six Roslindale employees who transferred to the Brockton facility constituted forty percent of the former bargaining unit, the same percentage found by the Board in Westwood Import to be substantial. Accordingly, the Board applied the contract-bar doctrine here, as it did in Westwood Import, and concluded that the Company, precluded from questioning the Union's majority status during the term of an existing collective bargaining agreement, had violated the Act by changing the terms of employment and refusing to recognize and bargain with the Union upon relocating.
 
 
 20
 The Company argues that the contract-bar doctrine is inapplicable in this case, claiming that it had the right to question the majority status of the Union at the Brockton facility. Its reliance on our decision in NLRB v. Massachusetts Machine and Stamping, Inc., 578 F.2d 15 (1st Cir. 1978) (Mass. Machine ), is misplaced. Mass. Machine involved a relocation forty miles away across state lines, from Roxbury, Massachusetts, to Nashua, New Hampshire. We do not think this can be equated with a seventeen-mile relocation within the same state. Moreover, the collective bargaining agreement in Mass. Machine contained a clause specifically providing that the agreement would remain in force should the Company relocate within thirty miles of Roxbury. Because of the specific geographical limitation in the collective bargaining agreement in Mass. Machine, we focused on the employer's right to act upon a good faith doubt of the Union's majority status without considering at all the effect of the contract. Our concern over a "substantial change in geographical location" resulting from a "move to a location forty miles away in a different state," 578 F.2d at 20, was expressed, therefore, in a context devoid of consideration of an existing collective bargaining agreement.
 
 
 21
 The question here, by contrast, is whether the collective bargaining agreement triggered the modified contract-bar doctrine as explicated in Westwood Import. We believe it did. The Board supportably found sufficient continuity after relocation to justify holding that the contract was effective at the new Brockton facility. We, therefore, uphold the Board's conclusion that by failing and refusing to recognize and bargain with the Union, by unilaterally changing working conditions, and by failing and refusing to apply the terms of its existing bargaining agreement to the employees at Brockton, the Company violated section 8(a)(5) and (1) and section 8(d) of the Act.
 
 
 22
 The Board's ruling that the Company violated section 8(a)(1) by making certain statements to employees presents a closer question. The contents of the statements are undisputed; the issue is the interpretation they are to be given.
 
 
 23
 Section 8(a)(1) makes it an unfair labor practice for an employer to interfere with, restrain, or coerce employees in the exercise of their organizational rights. It is the coercive tendency of employer statements, not their actual effect, that constitutes a violation of the Act. Soule Glass and Glazing Co. v. NLRB, 652 F.2d 1055, 1077 (1st Cir. 1981); Russell Stover Candies, Inc. v. NLRB, 551 F.2d 204, 208 (5th Cir. 1977). The Board's inference of coercive tendency will be upheld if reasonable, NLRB v. Cable Vision, Inc., 660 F.2d 1, 3, 5-7 (1st Cir. 1981); NLRB v. Haberman Construction Co., 618 F.2d 288, 296 (5th Cir. 1980), even if the statements are susceptible of a noncoercive interpretation. NLRB v. Fort Vancouver Plywood Co., 604 F.2d 596, 599 n.1 (9th Cir. 1979). Generally, courts will defer to the Board's special expertise on the impact of employer statements to employees. NLRB v. Gissell Packing Co., Inc., 395 U.S. 575, 620, 89 S.Ct. 1918, 1943, 23 L.Ed.2d 547 (1969); Hedstrom Co. v. NLRB, 629 F.2d 305, 314 (3d Cir. 1980) (in banc), cert. denied, 450 U.S. 996, 101 S.Ct. 1699, 68 L.Ed.2d 196 (1981); NLRB v. Amoco Chemicals Co., 529 F.2d 427, 430 (5th Cir. 1976); Dubin-Haskell Lining Corp. v. NLRB, 375 F.2d 568, 571 (4th Cir. 1967), cert. denied, 393 U.S. 824, 89 S.Ct. 83, 21 L.Ed.2d 95 (1968). With these principles as a guide we examine what was said.
 
 
 24
 After conducting initial interviews of its Roslindale employees to determine which ones desired to transfer to Brockton, the Company again interviewed those who had expressed an interest. During this second round of interviews, employees were told of the working conditions and employee benefits that would be in effect at the Brockton facility, which differed from the terms of the collective bargaining agreement and their current employment at Roslindale.[6] The employees were also told, after they inquired, that the Company did not expect to recognize the Union unless a majority of the Brockton employees desired to be represented and that it did not intend to apply the existing contract at the Brockton facility.
 
 
 25
 Without giving the reasons for his ruling, the ALJ concluded, and the Board summarily affirmed, that the Company, by advising employees that it intended not to recognize the Union or apply the contract at Brockton and that significant working conditions would be different, violated section 8(a)(1) of the Act. In this petition for enforcement the Board argues that the Company's statements could reasonably be interpreted by employees as a message that union membership would be futile. See NLRB v. Patent Trader, Inc., 415 F.2d 190, 199 (2d Cir. 1969), modified on other grounds, 426 F.2d 791 (1970). The Company argues, on the other hand, that the statements were not coercive and were based on the Company's good faith perception of its legal position with respect to the Union.
 
 
 26
 After viewing the statements together and in context, we are inclined to accept the Board's interpretation. See NLRB v. Intertherm, Inc., 596 F.2d 267, 275 (8th Cir. 1979); NLRB v. Sandy's Stores, Inc., 398 F.2d 268, 270 (1st Cir. 1968). The Company told the inquiring employees that the Union would not follow them to Brockton. The statement that there would be no union unless a majority desired one merely told the employees what they presumably already knew. The statements as to the different wages, hours, and benefits were made on a take-it-or-leave-it basis. The Company, therefore, was making two things clear: that the move to Brockton meant the end of the current collective bargaining agreement and that the Company intended to change the conditions of employment. It was stipulated that the Company's position with regard to withdrawing recognition from the Union became known throughout the bargaining unit, following on the heels of its refusal to bargain upon the Union's demand. Under the circumstances, we believe the Board's inference is a reasonable one. Although the relocation was not prompted by antiunion animus, we think a strong inference can be made that the Company took advantage of the relocation as an opportunity to rid itself of the Union. Accordingly, we affirm.
 
 
 27
 The order of the Board will be enforced.
 
 On Petition for Rehearing
 
 28
 The petition for rehearing is denied. The court did not overlook a dispositive fact and point of law. We did not think, nor do we think now, that whether or not Brockton and Roslindale are in separate "labor markets" is dispositive. In Westwood Import Company, Inc., there is nothing in the Board opinion indicating that "labor market" consideration is part of the test. The Board affirmed the ALJ's rulings and findings, which included dicta about the same "labor area." It is clear that the ALJ did not rely on the same "labor area" factor in reaching his conclusions.
 
 
 29
 The test that the Board established in Westwood was "an existing and effective collective bargaining agreement remains in effect following a relocation, provided operations and equipment remain substantially the same at the new location, and a substantial percentage of the employees at the old plant transfer to the new location." 251 N.L.R.B. 1213, 1214. There is nothing in the Board opinion about the same or different "labor markets."
 
 
 
 [1]
 The United Electrical Workers Union, Local 408, International Union of Electrical, Radio and Machine Workers
 
 
 [2]
 The Union had been the exclusive bargaining representative at the predecessor facility since 1954, as evidenced by a succession of collective bargaining agreements
 
 
 [3]
 The schedule below shows the transfer of employees from the Roslindale facility to the Brockton facility:
 Employed Employed
 at at
 Roslindale Brockton
 formerly
week ending new hires at Roslindale
10/6 64 3
10/13 63 8
10/20 58 8 1
10/27 54 13 3
11/3 28 18 12
11/10 26 24 14
11/17 26 23 14
11/24 12 25 15
12/1 30 19
12/8 41 26
12/15 38 26
12/22 38 26
12/29 36 26
 
 
 [4]
 Without deciding the credibility issue, the ALJ assumed the correctness of Izzi's testimony
 
 
 [5]
 "All production employees employed by (the respondent), but excluding all shippers, tool and die makers, machinists, machinist apprentices, maintenance employees, guards, watchmen, executives, foremen, assistant foremen, office and clerical employees, salesmen and professional employees."
 
 
 [6]
 The most significant change was the absence of a pension plan