**LAMMERT INDUSTRIES, a Division of Componetrol, Inc., a Subsidiary of I–T–E Imperial Corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

No. 77–1660.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 22, 1978.

Decided June 29, 1978.

---

William P. Treacy, Wilmette, Ill., for petitioner.

Elliott Moore, N. L. R. B., Washington, D. C., for respondent.

Before PELL and BAUER, Circuit Judges, and MARSHALL, District Judge.*

PELL, Circuit Judge.

This is a petition for review and cross-application for enforcement of a National Labor Relations Board (Board) order issued on May 24, 1977. The Board held Lammert Industries (Company) in violation of §§ 8(a)(1), 8(a)(3), and 8(a)(5)[1] of the National Labor Relations Act (Act). The Company raises here only that portion of the Board's order which under § 8(a)(5) requires the Company to bargain with the International Association of Machinists and Aerospace Workers, District No. 8 (Union) at the Company's new Fullerton plant.

The Company had operated a factory in Chicago for over 30 years where it manufactured vacuum pumps and compressors. The Union had been the exclusive bargaining representative of the production and maintenance employees at this plant since 1945 and had entered into a series of collective bargaining contracts with the Company, the most recent of which covered a two-year period from February 1, 1973 to February 1, 1975. This contract, by its terms, was self-perpetuating from year to year after its expiration unless either party gave written notice of its desire to terminate.

In 1969, the Company acquired a small plant on Westwood Avenue in Addison, Illinois, a suburb located approximately 20 miles from Chicago. This plant also manufactured vacuum pumps and compressors. The production and maintenance employees at this plant were not represented by a union.

On November 27, 1974, a decertification petition was filed by employees at the Chicago plant. Pursuant to that petition, the Board, on March 7, 1975, conducted a decertification election for the Chicago production and maintenance employees. The vote was 11 to 10 in favor of decertification. Because certain pre-election conduct engaged in by the Company was found to have created an atmosphere of coercion and to have interfered with the holding of a free and fair election, the Board set aside that election.

In September 1975, the Company permanently closed both its Chicago facility and its auxiliary Westwood Avenue facility in Addison and moved both operations to a newly constructed plant on Fullerton Street in Addison. When the Company closed its Chicago plant it transferred 19 of the 20 production and maintenance employees to the Fullerton plant. Similarly, upon the closing of the Westwood plant, the Company transferred the seven production and maintenance employees to Fullerton. The seven employees from the Westwood plant had the same job classifications as the unit employees from the Chicago plant. Thus, on the day the Company commenced operations at the new Fullerton facility, it employed 26 production and maintenance employees: 19 from the union-represented Chicago plant and 7 from the unrepresented auxiliary facility on Westwood Avenue.[2]

---

* Judge Prentice H. Marshall of the United States District Court for the Northern District of Illinois is sitting by designation.

1. Section 8(a)(5) of the Act provides:
 It shall be an unfair labor practice for an employer to refuse to bargain collectively with representatives of his employees, subject to the provisions of section 159(a) of this title.

29 U.S.C. § 158(a)(5).

2. No new employees were hired when the Fullerton plant first began operations on or about September 15, 1975. As of January 28, 1976, three of the original transferees from the Chicago plant had ceased employment and the unit had increased to 33 employees through new hirings.

All the production and maintenance employees at the Fullerton facility performed the same unit work under the same conditions of employment. They worked the same hours, had the same break times, and shared common lunchroom and locker facilities. They all participated in common benefits. The unit employees interchangeably performed work on both pumps and compressors and they all worked under the same supervision. Earl McGlone, the former manager of both the old plants, continued to function in the same capacity at the new plant.

Based on the foregoing, the Board found "that the former Chicago 19 member bargaining unit retained its majority status after its transfer to the new [Fullerton] . . . plant notwithstanding the fact that the 7 production and maintenance workers from the old [Westwood] . . . plant were added to its ranks on the day of the opening of the new plant." Concluding that "the smaller old [Westwood] plant unit was absorbed into and became a part of the former established larger unit from the Chicago plant," the Board found that the Westwood unit was accreted [3] into the Chicago unit and that the Company had a continuing obligation to bargain with the Union at the new facility. The Company's refusal to recognize and bargain with the Union was, therefore, found to violate § 8(a)(5) of the Act.

 Generally, if an employer relocates and the new plant is considered merely a continuation of the old one, the employer must continue to recognize and bargain with the union which represented the employees at the old plant. *N.L.R.B. v. Die Supply Corp.*, 393 F.2d 462 (1st Cir. 1968). In the present case the Company, upon opening the new Fullerton plant, transferred nearly the entire bargaining unit from

the Chicago plant to the new facility where these employees engaged in the same work, producing the same product as at the old facility. This is clearly a situation in which the employer must continue to recognize and bargain with the union at the relocated plant. The critical issue is the effect of the transfer of the 7 employees from the unrepresented Westwood Avenue plant on the employer's duty to bargain. The Board held, and we agree, that these 7 employees constituted an accretion to the 19-employee unit composed of former Chicago plant employees.

The Board's determination that the former Westwood Avenue employees constituted an accretion "is similar to its function of determining the appropriateness of particular units for bargaining purposes. . . The determination is one involving the Board's discretion and should not be set aside unless a reviewing court is convinced that the Board has acted in an arbitrary and capricious manner." *N.L.R.B. v. R.L. Sweet Lumber Co.*, 515 F.2d 785, 794 (10th Cir. 1975), *cert. denied*, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302, *International Union, U.A.W. v. N.L.R.B.*, 231 F.2d 237, 243 (7th Cir. 1956), *cert. denied*, 352 U.S. 908, 77 S.Ct. 146, 1 L.Ed.2d 117. In determining whether certain employees constitute an accretion, the Board compares them to the employees in the larger unit and examines such factors as similarity of working conditions, job classifications, skills and functions, similarity of products, interchangeability of employees, geographical proximity, and centralization of managerial control. *See id.* After considering these factors we are of the opinion that the Board did not act in an arbitrary or capricious manner and thus did not abuse its discretion in finding the seven employees from the Westwood Avenue plant to be an accretion. In sum, this relatively small group of employ-

---

**3.** An accretion is simply the addition of a relatively small group of employees to an existing unit where these additional employees share a sufficient community of interest with the unit employees and have no separate identity. The additional employees are then properly governed by the unit's choice of bargaining representative. *N.L.R.B. v. Food Employers Council, Inc.*, 399 F.2d 501, 502–03 (9th Cir. 1968).

ees met the accretion guidelines set out above.

The Company, in support of its argument that an election should be held at the new plant, relies on cases in which an employer opening a new plant transferred employees from two other plants, but where the employees from the two other plants were represented by two different unions. *See, e. g., Hudson Berlind Corp.*, 203 NLRB 421 (1973), *enforced sub nom. N.L.R.B. v. Hudson Berlind Corp.*, 494 F.2d 1200 (2d Cir. 1974); *Purolator Products, Inc.*, 160 NLRB 80 (1966). These cases are inapposite because the existence of rival unions on the scene raises the immediate problem of an employer favoring one union over the other in violation of the employer's duty of neutrality. *See Midwest Piping Co.*, 63 NLRB 1060 (1945).[4] None of the cases cited by the Company involves an accretion of formerly unrepresented employees into a much larger unit of union-represented employees.

■ In the Company's argument, it views the employee complement at the new facility several months after it opened. At this later time, of the 33 employees, 16 were from the Chicago plant, 7 were from the Westwood Avenue plant, and 10 were newly employed. The implication is that less than a majority of the employees at the later date came from the union-represented facility. Although we need not decide whether the Company would have properly been ordered to bargain with the Union if

at the opening of the new plant, less than a majority of the employees came from the union-represented facility, we have no question but that the appropriate point of analysis is ordinarily the date the new facility opened and began full operations.[5] Replacements after that date do not, in most situations, affect the presumption of the union's continuing majority status. These replacements are presumed to support the union in the same ratio as those they replace.[6] *See King Radio Corp.*, 208 NLRB 578, 583 (1974), *enforced sub nom. N.L.R.B. v. King Radio Corp.*, 510 F.2d 1154 (10th Cir. 1975), *cert. denied*, 423 U.S. 839, 96 S.Ct. 68, 46 L.Ed.2d 58. We find no reason for deviating here from the ordinarily applicable rule.

For the reasons stated herein, we deny the Company's petition for review and grant the Board's cross-application for enforcement.

4. An employer faced with rival unions seeking recognition can, in some circumstances not present in the case before us, recognize and bargain with one union without incurring §§ 8(a)(1) and 8(a)(2) violations under the *Midwest Piping* doctrine. *See Playskool, Inc. v. N.L.R.B.*, 477 F.2d 66 (7th Cir. 1973).

5. The Board properly found that an accretion occurred upon the opening of the new plant on September 15, 1975, and that the Company's bargaining obligation continued at Fullerton as of that date. Thus, the bargaining obligation attached at the time of the relocation when the new plant commenced full operations. There has never been any contention that the Company was only in partial operation when it opened the new plant or that it contemplated significantly expanding the unit. Moreover,

even if the employer demonstrates that an expansion is contemplated, the Board will not delay the bargaining obligation if, as here, the Company has hired a substantial and representative complement of employees. *See Clement-Blythe Companies*, 182 NLRB 502, *enforced sub nom. N.L.R.B. v. Clement-Blythe Companies*, 77 L.R.R.M. 2373 (4th Cir. 1972).

6. Furthermore, normal employee turnover does not create a good faith doubt of the union's continuing majority status and thus does not relieve an employer of its bargaining obligation. *Zim's Foodliner, Inc. v. N.L.R.B.*, 495 F.2d 1131, 1141 (7th Cir. 1974), *cert. denied*, 419 U.S. 838, 95 S.Ct. 66, 42 L.Ed.2d 65. *Cf. National Cash Register Co. v. N.L.R.B.*, 494 F.2d 189 (8th Cir. 1974).