**UNIVERSAL SECURITY INSTRU-
MENTS, INC., Petitioner,**

v.

**NATIONAL LABOR RELATIONS
BOARD, Respondent,**

and

**Industrial Union of Marine and Ship-
building Workers of America,
AFL–CIO, Intervenor.**

No. 80–1494.

United States Court of Appeals,
Fourth Circuit.

Argued Feb. 4, 1981.
Decided May 12, 1981.

Warren M. Davison, Baltimore, Md. (Earle K. Shawe, Leslie R. Stellman, Stephen D. Shawe, Shawe & Rosenthal, Baltimore, Md., on brief), for petitioner.

Susan L. Williams, N. L. R. B., Washington, D. C. (William A. Lubbers, Gen. Counsel, John E. Higgins, Jr., Deputy Gen. Counsel, Robert E. Allen, Acting Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, William R. Stewart, Deputy Asst. Gen. Counsel, Washington, D. C., on brief), for respondent.

Michael Brodie, Philadelphia, Pa. (Freedman & Lorry, Philadelphia, Pa., on brief), for intervenor.

Before HAYNSWORTH, Chief Judge, BUTZNER, Circuit Judge, and WILLIAMS, District Judge.*

RICHARD L. WILLIAMS, District Judge:

Universal Security Instruments, Inc. has petitioned this court to review a finding by the National Labor Relations Board of several violations of § 8(a)(5) and (1) of the National Labor Relations Act, 29 U.S.C. § 151 *et seq.* The Board, through its General Counsel, has cross-petitioned for enforcement of its order and the union has intervened on behalf of the Board.

## I. FACTUAL SETTING

The facts of this case were laid out in the Decision and Order of the Board and in the Administrative Law Judge's (ALJ) decision. *See* 250 NLRB No. 92 (1980). While we feel no need to repeat all that is printed there, we must, however, explain the factual setting of this case in some detail.

Universal was founded in 1969 and initially manufactured electromechanical sirens and other security equipment. After several years of working in small facilities, the company leased a plant in Baltimore, Maryland on Potee Street in 1971. In 1973, the Industrial Union of Marine & Shipbuilding Workers of America, AFL–CIO (the union), gained representation rights through a National Labor Relations Board

---

* The Hon. Richard L. Williams, United States District Judge for the Eastern District of Virginia, sitting by designation.

conducted election. The union was to represent the production and maintenance workers at the Potee Street plant.

In August of that year the union and the company signed a three-year collective bargaining agreement. The agreement, among other things, contained a clause which recited that it was to cover all production and maintenance workers "at [Universal's] Baltimore, Maryland facility, at 2829 Potee Street. . . ." The agreement also contained what was labelled a "Management Rights" clause which said that the union "recognizes that the Company shall have the sole and exclusive jurisdiction of the management and operation of its business, . . . and the right to relocate its plant or any portion thereof." The collective bargaining agreement extended to August 1, 1979, and this agreement was in effect at all times material to this case.

At about the same time that the company and the union were negotiating and signing the original collective bargaining agreement covering the Potee Street plant, the company entered the electronics field by making electronic smoke detectors and sirens. This was an expanding market, and because of this expansion, Universal leased a warehouse on Hollins Ferry Road in order to step up the production of smoke detectors and other electronic equipment. Hollins Ferry Road, which began production in 1975, was about 2.7 miles away from the Potee Street facility.

Universal originally staffed the Hollins Ferry Road plant with employees from Potee Street, who would punch in at Potee Street and be driven to Hollins Ferry Road. Eventually Universal hired employees directly for assignment to Hollins Ferry Road. The company voluntarily applied the union dues check-off provision of the existing collective bargaining agreement to the Hollins Ferry Road employees. In May of 1976 Universal formally recognized the union as the collective bargaining representative of the workers at Hollins Ferry Road without requiring proof that the union represented a majority of the workers at that plant.

The company's markets continued to expand and by the spring and summer of 1977, 300 employees were working at the Hollins Ferry Road facility. However, all parties to this action agree, and both the ALJ and Board found, that the conditions at the Hollins Ferry Road plant were poor and both workers and management were dissatisfied with the facilities.[1] Because of these poor conditions, the company began to look for a new, better plant.

After considering several locations, Universal settled on a plant location at Owings Mills, Maryland, which was about 27 miles away from its other two facilities. This location was chosen because it was easily accessible by Baltimore public transportation and the company planned to hire from the Baltimore metropolitan area labor pool. In fact, one of the bus lines which served the Owings Mills plant also ran by the Potee Street plant, a factor which company officials considered to be positive.

In March of 1977, Universal purchased the Owings Mills plant with the intention of using it to supplement its production facility at Hollins Ferry Road but not to replace that facility. Production began at Owings Mills in mid-September, 1977.

Although the company never informed the union formally of the impending expansion at Owings Mills, union members found out that the company was planning a new

---

1. The ALJ on page 4 of his decision wrote:

The ceilings were too high. Temperature and humidity could not be adequately controlled within and the employees were over-crowded. The Hollins Ferry Road facility was too hot in the summer and too cold in the winter. There was inadequate space for [Universal's] production operation. State and local authorities complained to [Universal] about fire hazards and inadequate sanitation.

These conditions impaired plant operations. The overcrowded conditions in the plant production area caused [Universal] to move its research and quality control activity to a trailer. Further, these shortcomings caused poor productivity and poor product quality at the Hollins Ferry Road plant.

facility. They made several inquiries as to when the new plant was going to open and if the union would be recognized there, but these questions were never directly answered. In August or September of 1977 the site of the new plant was visited by union officials and on or about September 12, 1977 the union requested that Universal recognize it as the bargaining representative of the employees at Owings Mills. This request was denied by the company. After some organizational efforts by the union failed, the union filed a grievance against the company for denying this request. The General Counsel issued a complaint and notice of a hearing on January 6, 1978.

In early October, 1977, Universal officials decided that the Owings Mills plant, which was to be primarily staffed by newly hired employees, needed a certain number of experienced workers. Universal chairman Stephen Knepper authorized personnel director Robert O'Neill to recruit several Hollins Ferry Road employees for transfer to the new facility. O'Neill asked four Hollins Ferry Road workers if they would transfer to the new plant. He did not select the workers asked by seniority, but based the offers on recommendations by company management. Three of the four accepted the offer. At no time did the company notify the workers' bargaining representative that it was making these unilateral offers.

Again in late October the company offered transfers to 15 other Hollins Ferry Road employees, once again not selected on the basis of seniority. Twelve of these fifteen accepted the offer. The three who did not were laid off due to adverse business conditions.

By the end of September, 1977, Owings Mills had 65 production and maintenance employees, and by the end of October, 1977 the plant had 80 employees. Hollins Ferry Road at that same time had 200 and Potee Street about 50.

One of the 15 employees offered transfers in late October was Teresa Egitto. O'Neill informed her that she was laid off but could resume working at the Owings Mills plant.

She testified that she was told that the work there would be the same, but that there was no union at the new facility and, because of this, the working conditions and benefits were better. She also claimed that O'Neill told her that if the employees at Owings Mills decided to have the union represent them, the working conditions at Owings Mills would deteriorate.

O'Neill also told several of the employees who had transferred that they would retain their seniority with the company for vacation purposes and other benefits, but that for layoffs, plant seniority would be the rule. Also, wages, benefits and other terms and conditions of employment were different from that which was negotiated with the union and embodied in the collective bargaining agreement.

Because of various market problems, Universal began to experience serious setbacks in the smoke detector market, beginning at the end of October, 1977. These setbacks forced a general layoff which affected the employees of all three of the company's plants. This layoff was terminated in January of 1978, but the market setbacks, along with the inefficiency of the Hollins Ferry Road plant, made that facility unprofitable for the company. On February 1, 1978, Universal's director of operations Amadee Dean recommended to chairman Knepper that Hollins Ferry Road be closed down. The next day Knepper decided to follow this recommendation and began to plan for the plant's closure by the end of that month. On February 3, Knepper authorized O'Neill to offer transfers to Owings Mills to the Hollins Ferry Road employees. That same day O'Neill began making offers to the employees on a seniority basis. Each employee was asked to fill out a card acknowledging that the offer was made and indicating his or her decision on the offer. Those who refused transfers to Owings Mills were told that positions might not be open at Potee Street, but that they would be placed on a preferential hiring list for that plant.

Seventy-two of the Hollins Ferry Road employees accepted the offer of transfer

and thirty-one declined. Of the 31 who declined, two were given positions at Potee Street. The other 29 were laid off.

In addition to beginning the transfer process, the company also wrote to the union regarding the closure of the Hollins Ferry Road plant. In a letter dated February 3, 1978, a lawyer for the company wrote to union officials to inform them that "it will probably be necessary for the Company to close its Hollins Ferry Road ... plant within the next few weeks.... [T]he Company is hereby offering to meet with you, at a mutually convenient time and place, to discuss all aspects of this matter, including, but not limited to, the impact that such closing would have upon the employees at that plant." That letter also informed the union that offers of transfer were going to be made "to as many of the Hollins Ferry Road plant employees as possible."

The first group of Hollins Ferry Road employees who accepted the transfers began to arrive for work at Owings Mills as early as February 8, 1978. They were told of the new health and wage improvements, which were different from those called for under the collective bargaining agreement. They were also told of the change in the seniority system for layoffs. At this meeting O'Neill also told the transferees that no union would be recognized at that plant and, because of this, working conditions and benefits would be better than they were at Hollins Ferry Road.

The first of several meetings with union officials did not take place until February 14. The principal issue between the company and the union was whether or not the company planned to recognize the union as the bargaining representative at the new facility. The company steadfastly refused to do so. Some other minor topics were brought up, but apparently no major discussions were held on any other topics. The Hollins Ferry Road plant was closed permanently February 28, 1978.

The Board found that the production and maintenance employees at Owings Mills constituted an accretion to the bargaining unit at Potee Street and Hollins Ferry Road and, because of this, Universal had violated § 8(a)(5) and (1) of the Act[2] by refusing to recognize the union as the bargaining representative at Owings Mills and refusing to apply the terms of the collective bargaining agreement to the production and maintenance workers at that facility. The Board also found violations of these sections of the Act by Universal's unilateral transfer of unit working employees from Hollins Ferry Road to Owings Mills and by making offers of transfers to the employees without consulting and bargaining with the union. The Board also found the company's failure to bargain with the union over its decision to close the Hollins Ferry Road plant to be a violation of § 8(a)(5) of the Act and found that the company also failed to bargain with the union over the effects of that closing. The Board finally found that the company violated § 8(a)(1) by threatening employees with reprisals if they should try and have the union represent them at the new plant.

To remedy these violations the Board ordered:

(1) That the company cease and desist from these unfair labor practices and refrain from restraining employees in the exercise of their rights under § 7 of the Act;

(2) The company to recognize the union as the collective bargaining agent of the production and maintenance workers at Owings Mills, to apply the terms of the agreement to those employees retroactively, and to make the employees whole for any losses they may have suffered as a result of the

2. § 8(a) reads as follows:

It shall be an unfair labor practice for an employer—
(1) to interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in section 7.

\* \* \* \* \* \*

(5) to refuse to bargain collectively with the representatives of his employees....

unlawful refusal to apply the terms of the agreement to them;

(3) The company to bargain upon request by the union, over the transfer of employees to the new plant, the closure of the Hollins Ferry Road plant and the effects on employees of the plant closures;

(4) A limited back-pay award to be made to the 29 employees who were laid off after refusing transfers to Owings Mills;

(5) The company post appropriate notices at the Owings Mills facility and the Hollins Ferry Road plant, should that plant ever reopen.

Universal has asked this court to review the Board's decision and order and the Board has cross-petitioned for enforcement.

## II. THE ACCRETION ISSUE

The Board found that Universal's Owings Mills plant constituted an accretion to the Hollins Ferry Road plant as of September 12, 1977, the approximate date on which the union representatives requested recognition of the union at Owings Mills.

■ " 'An accretion' occurs when new employees are added to an already existing [bargaining] unit." *N.L.R.B. v. Sunset House*, 415 F.2d 545, 547 (9th Cir. 1969). The additional employees are absorbed into the existing unit without first having an election "where these additional employees share a sufficient community of interest with the unit employees and have no separate identity. The additional employees are then properly governed by the unit's choice of bargaining representative." *Lammert Indus. v. N.L.R.B.*, 578 F.2d 1223, 1225 n.3 (7th Cir. 1978).

■ If the employees hired and transferred to Owings Mills did constitute an accre-

tion, Universal violated the Act by its failure to bargain, because it unilaterally changed wages, seniority and benefits—all unquestionably "terms and conditions of employment" within the meaning of § 8(d) of the Act [3]—of employees within a bargaining unit with which Universal already had a collective bargaining agreement. The company's duty to recognize the accretion is triggered by the request of the bargaining representative to negotiate. *Goodyear Tire & Rubber Co.*, 195 NLRB 767 (1972).

■ A finding of an accretion by the Board is similar to the Board's certifying a particular group of employees as an appropriate bargaining unit because in both the Board is using its expertise to determine the most appropriate mix of employees for a particular unit. *N.L.R.B. v. R. L. Sweet Lumber Co.*, 515 F.2d 785, 794 (10th Cir.), *cert. denied*, 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975); *N.L.R.B. v. Security-Columbian Banknote Co.*, 541 F.2d 135, 140–41 (3d Cir. 1976). And, just as when the Board certifies a unit, the Board's finding of an accretion is a matter which is generally committed to its discretion. *N.L.R.B. v. R. L. Sweet Lumber Co., supra; Lammert Indus. v. N.L.R.B., supra; N.L.R.B. v. Security-Columbian Banknote Co., supra*. Thus, its finding "should not be set aside unless the reviewing court is convinced that the Board has acted in an arbitrary and capricious manner." *N.L.R.B. v. R. L. Sweet Lumber Co.*, 515 F.2d at 794.

■ In making its determination the Board must closely analyze the circumstances of the workers to determine whether the new and old employees truly share a "community of interest." To do this several factors are scrutinized. These are: (1) similarity of working conditions; (2) job classi-

---

**3.** § 8(d) provides as follows:

For the purposes of this section, to bargain collectively is the performance of the mutual obligation of the employer and representative of the employees to meet at reasonable times and confer in good faith with respect to wages, hours, and other terms and conditions of employment, or the negotiation of an agreement, or any question arising thereunder, and the execution of a written contract incorporating any agreement reached if requested by either party, but such obligation does not compel either party to agree to a proposal or require the making of a concession. . . .

fication; (3) skills and functions; (4) similarity of products; (5) interchangeability of employees; (6) geographical proximity; (7) centralization of managerial control; *Lammert Indus. v. N.L.R.B.*, 578 F.2d at 1225; (8) functional integration of the business; (9) collective bargaining history. *N.L.R.B. v. R. L. Sweet Lumber Co.*, 515 F.2d 785. *See also Peter Kiewit Sons' Co.*, 231 NLRB 76 (1977).

> In determining whether a group of employees represents an accretion to an existing unit the Board must consider unique and complex sets of facts in light of the somewhat conflicting policies of stability in bargaining relations, ... and assurance to employees of the right to choose their own bargaining agents.

*N.L.R.B. v. Food Employers Council, Inc.*, 399 F.2d 501, 504 (9th Cir. 1968) (citations omitted).

█ Chairman Knepper testified before the ALJ that Owings Mills was established to supplement Hollins Ferry Road's production of smoke detectors and that both plants produced the same product—the SS–200 model smoke detector—until the October 31 general layoff.

Also, workers were required to have similar skills at both plants, demonstrated by the fact that 15 Hollins Ferry Road employees were transferred in October, 1977 to Owings Mills to provide the new plant with experienced workers and to help train newly hired employees. Further, in February, 1978 Universal offered its workers at Hollins Ferry Road transfers to Owings Mills when the company closed down Hollins Ferry Road. Both of these factors tend to show that there were similar skills required at the two facilities.

As for geographic proximity Owings Mills was about 27 miles away from Hollins Ferry Road. Despite this distance both plants drew their workers from the metropolitan Baltimore labor pool. In fact, Universal advertised for workers not only in suburban Baltimore newspapers but also in the *Baltimore Sun*. Also, Knepper chose the Owings Mills plant in part because of its proximity to a Baltimore city bus route which also ran past Potee Street.

A centralized management system controlled all three facilities. This included centralized control over production by director of operations Amadee Dean, who as part of his job established the qualifications for employees at Owings Mills. Also, the director of human relations, O'Neill, hired the new employees for Owings Mills and interviewed and transferred employees from Hollins Ferry Road to Owings Mills. He was in charge of hiring and firing and employee relations.

These factors relied upon by the Board show: (1) there was a similarity of skills required at Owings Mills and the other plants; (2) there was a similarity of product produced; (3) the new facility was geographically close to the other two facilities when the metropolitan area is viewed as a whole; and (4) management, and most importantly, employee relations, were centralized.

While the ALJ and the Board did not analyze all nine of the factors which have been identified in previous cases as helpful in making an accretion determination, those analyzed are certainly sufficient to show that the Board did not abuse its discretion in finding an accretion. There is no requirement that all of the listed factors be present, for to so require would be to hamstring the Board by requiring it to plug each unique case into an artificial test. The Board has a duty to "unearth[ ] the factors relevant to the accretion issue in the case under consideration ... [and] then decide[ ] the relative weight to be attributed to each factor." *Kaynard v. Mego Corp.*, 484 F.Supp. 167, 172 (E.D.N.Y.1980).

Universal argues to this court that the union did not represent a majority of the Owings Mills employees on the date it opened (September 19, 1977); when the union filed its grievance (November 8, 1977); on the date when the union filed its first unfair labor practice charge (November 17, 1977); when it amended the charge (December 9, 1977); or on the date the complaint issued in this case (January 6, 1978). The company's assertion is that newly hired

employees at Owings Mills outnumbered those transferred from its other plants, and that the newly hired employees had never expressed a preference for union representation.

Universal's argument misses the mark. The important fact is that at the end of the summer of 1977, the number of employees in the bargaining unit at Potee Street and Hollins Ferry Road had risen to between 350 and 360. At the end of September, 1977, there were only 65 factory workers and 8 supervisors at Owings Mills. When an accretion occurs, the smaller group of employees is treated as if it were a group of newly hired employees replacing workers within the unit. Replacement employees are presumed to support the unit in the same ratio as those replaced. *Lammert Indus. v. N.L.R.B.*, 578 F.2d at 1226. Because of the "community of interest" found in this case, this smaller group at Owings Mills automatically became part of the bargaining unit.

The accretion doctrine is applied more restrictively when the new group of employees is larger than the original unit. "[T]he Board is cautious in making such a finding, particularly when the accreted group numerically overshadows the existing certified unit, because it would deprive the larger group of employees of their statutory right to select their own bargaining representative." *Renaissance Center Partnership*, 239 NLRB 1247, 1247–48 (1979). This, however, is not the case at bar. For the stated legitimate reasons the Board has found a smaller new group to be an accretion, and such was well within the Board's discretion. Since the Board was within its discretion when it found an accretion, it follows that Universal violated § 8(a)(5) and (1) of the Act by its refusal to recognize the union as the bargaining representative of the Owings Mills employees and its failure to apply the collective bargaining agreement to those employees.

It also follows that Universal violated § 8(a)(5) and (1) by unilaterally changing

terms and conditions of employment of employees subject to a collective bargaining agreement. Universal's bargaining obligation is defined by § 8(d) of the Act. That section provides, in summary, that neither party to a collective bargaining agreement can unilaterally modify the agreement without first serving written notice and offering to negotiate.[4] When a specific item is included in a collective bargaining agreement, any unilateral change, therefore, violates the duty defined by § 8(d) and made unlawful by § 8(a)(5) and (1). *N.L.R.B. v. Baltimore News American Division*, 590 F.2d 554 (4th Cir. 1979).

Since Universal did not live up to the duty imposed by § 8(d) and enforced by § 8(a), to provide written notice and to offer to negotiate, the Board was supported by substantial evidence when it concluded that Universal violated the Act by altering the conditions of employment for the employees at Owings Mills, including the transferees.

### III. THE CLOSING OF HOLLINS FERRY ROAD

The Board found that Universal had also violated § 8(a)(5) of the Act by failing to bargain over both the decision to close the Hollins Ferry Road plant, and the effects that closure would have on the unit members working there. This involves two separate questions which will be addressed individually.

#### A. The Decision.

An employer is required "to confer in good faith with respect to wages, hours and other terms and conditions of employment." Section 8(d). Section 8(a)(5) makes it an unfair labor practice for an employer "to refuse to bargain collectively with the representative of his employees . . . ." These sections together make it an unfair labor practice for an employer to refuse to bargain in good faith over "wages, hours [and] . . . terms and conditions of employment," and these subjects are con-

---

**4.** See footnote 3 for full text of § 8(d).

sidered to be mandatory subjects over which the parties cannot lawfully refuse to bargain. *N.L.R.B. v. Wooster Div. of Borg-Warner Corp.*, 356 U.S. 342, 348–49, 78 S.Ct. 718, 722, 2 L.Ed.2d 823 (1958). Bargaining subjects which are not mandatory are permissive and may be bargained over, but a party can also refuse to so bargain. *Id.*

The Board has taken the position in this and other cases that an employer's decision to close one of its plants—a partial closing [5] —is a mandatory subject.[6]

The various circuit courts have not all agreed with the Board, with some holding that an economically motivated decision is not a mandatory subject,[7] while two circuits have recently adopted a theory that a partial closing is rebuttably presumed to be a mandatory bargaining subject.[8]

This court has yet to address this issue directly.

Universal claims, however, that no matter what the answer to this question is, the collective bargaining agreement it signed with the union gave the company the right to relocate its plant. The "management rights" clause in the agreement to which it points gave Universal the right to "relocate its plant or any portion thereof." [9]

Citing the Board's decisions in *Ador Corp.*, 150 NLRB 1658 (1965) and *Consolidated Foods Corp.*, 183 NLRB 832 (1970), Universal claims that the clause demonstrates that the parties to the agreement bargained over how a relocation decision could be made and gave management the exclusive right to decide without further bargaining to move to Owings Mills.

■ It is clear that a union can waive its right to bargain over a mandatory subject, but such waiver "must be clear and unmistakable." *The Dow Chemical Co.*, 212 NLRB 333 (1974). "While it is true that a labor organization may enter into an agreement in which it waives the right to bargain about mandatory subjects of bargaining (wages, hours, etc.) such waiver ... will not readily be implied." *R. L. Sweet Lumber Co.*, 207 NLRB 529, 538 (1973).

■ The Board found that the "management rights" clause in the agreement between Universal and the union did not clearly and unmistakably cover the transfer of employees in unit work from Hollins Ferry Road to Owings Mills. We agree. At the time of Owings Mills' opening it was not a relocation as that term is normally used. It was hoped that the plant would supplement the ongoing operations at Potee

---

5. A "partial closing" is considered to be a closing of one or more facilities by the employer having more facilities than those which he is closing. *Textile Workers' Union v. Darlington Mfg. Co.*, 380 U.S. 263, 275, 85 S.Ct. 994, 1002, 13 L.Ed.2d 827 (1965).

6. *See, e. g., Ozark Trailers, Inc.*, 161 NLRB 561 (1966).

7. *See, e. g., Royal Typewriter Co. v. N.L.R.B.*, 533 F.2d 1030 (8th Cir. 1976); *N.L.R.B. v. Thompson Transport Co.*, 406 F.2d 698 (10th Cir. 1969); *N.L.R.B. v. Transmarine Navigation Corp.*, 380 F.2d 933, 939 (9th Cir. 1967); *N.L.R.B. v. Adams Dairy, Inc.*, 350 F.2d 108 (8th Cir. 1965); *cert. denied*, 382 U.S. 1011, 86 S.Ct. 619, 15 L.Ed.2d 526 (1966); *N.L.R.B. v. Royal Plating & Polishing Co.*, 350 F.2d 191 (3d Cir. 1965).

8. *N.L.R.B. v. First Nat. Maintenance Corp.*, 627 F.2d 596 (2d Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981); *Brockway Motor Trucks v. N.L.R.B.*, 582 F.2d 720 (3d Cir. 1978).

9. Article XII of the collective bargaining agreement provides:

The union recognizes that the Company shall have the sole and exclusive jurisdiction of the management and operation of its business, the direction of its workforce, including the assignment of tasks and machines to employees, the right to maintain discipline and efficiency in this plant, the right to promulgate and enforce reasonable working rules, the right to hire, discipline and discharge employees subject to the provisions of this Agreement, the right to establish starting times and quitting times, to establish or discontinue shifts, to assign employees to shifts, and the right to relocate its plant or any portion thereof. It is agreed that the rights enumerated above shall be deemed to exclude preexisting rights of management not herein listed to operate its business in the manner it sees fit, provided that they do not conflict with other provisions of this Agreement.

Street and Hollins Ferry Road.[10] The accretion occurred September 12, 1977 and the first transfer of employees from Hollins Ferry Road to Owings Mills did not occur until October. Until the decision to close Hollins Ferry Road was made on February 2, 1978, Universal intended to operate—and did operate—all three plants. Thus it is clear that the closing of Hollins Ferry Road was not a pure relocation and was nothing more than a partial closing. In no way can the union be said to have clearly and unmistakably waived its perceived right to demand bargaining over the closing. That the closing of Hollins Ferry Road occurred only a few months after the opening of Owings Mills does not obviate this fact.

In finding that the union had not waived its rights and that Universal had unlawfully failed to bargain over the closing decision, the ALJ ordered Universal to bargain with the union over the decision to close the plant—a decision which was irrevocably made in 1978. Since that time the plant has been abandoned by Universal and its lease on the property has long since expired. Bargaining over the decision to close, therefore, would accomplish nothing for the bargaining unit members. The Board has recognized before that when a plant has already been closed for economic reasons, and a bargaining order would not change that fact, such an order is inappropriate. In *Burroughs Corp.*, 214 NLRB 571 (1974), the employer did not contest a finding that it had violated the Act by failing to bargain over a decision to close, but contested the accompanying bargaining order because its lease had expired and its equipment removed from the plant. The Board refused to order bargaining, saying, "as the plant was closed for economic reasons and has been closed for some time, we do not believe any useful purpose would be served by requiring further bargaining with respect to the decision to close the plant." *Id.* at n.4.

We agree with this conclusion and apply it to this case. No useful purpose could possibly be served by a bargaining order requiring the parties to negotiate a foregone conclusion over three years after the fact.

This decision not to enforce this portion of the order can be said to be putting the cart before the horse since we have not yet settled the question of whether or not a partial closing decision is indeed a mandatory subject of bargaining. We are aware of the Supreme Court's holding in *Ford Motor Co. v. N. L. R. B.*, 441 U.S. 488, 99 S.Ct. 1842, 60 L.Ed.2d 420 (1979), in which the Court wrote that the Board's "judgment as to what is a mandatory bargaining subject is entitled to considerable deference." 441 U.S. at 495, 99 S.Ct. at 1848, and that "the judgment of the Board is subject to judicial review; but if its construction of the statute is reasonably defensible, it should not be rejected merely because the courts might prefer another view of the statute." 441 U.S. at 497, 99 S.Ct. at 1849.

In this case, however, since we have specifically rejected the remedy ordered by the Board, we need not make a detailed analysis of the Board's judgment on the closing decision. Furthermore, we are convinced that establishing a rule for this judicial circuit would be of minimal value anyway since the Supreme Court has recently decided to review this issue. *N. L. R. B. v. First National Maintenance Corp.*, 627 F.2d 596 (2d Cir. 1980), *cert. granted*, —— U.S. ——, 101 S.Ct. 854, 66 L.Ed.2d 798 (1981).

Enforcement of this portion of the order is, therefore, denied.

### B. *Closing Effects.*

Although there may be conflicting opinions as to whether an employer has a duty to bargain over a partial closing decision, it is clear that an employer must bargain with the union over the effects of that decision on the bargaining unit members. *N. L. R. B. v. North Carolina Coastal Motor*

---

**10.** Universal's labor counsel, Earle K. Shawe, testified before the ALJ that the Owings Mills plant was to supplement Universal's other plants rather than to serve as a relocation of the Hollins Ferry Road plant.

*Lines, Inc.*, 542 F.2d 637, 638 (4th Cir. 1976). *See also, N. L. R. B. v. Triumph Curing Center*, 571 F.2d 462, 474 n.11 (9th Cir. 1978); *Royal Typewriter Co. v. N. L. R. B.*, 533 F.2d 1030, 1039 (8th Cir. 1976); *International Ladies Garment Workers' Union, AFL–CIO v. N. L. R. B.*, 463 F.2d 907, 917 (D.C.Cir.1972).

■ Universal does not question its duty to bargain over the effects of its decision, but challenges the Board's conclusion that it did not bargain in good faith over the effects. The company points to its February 3, 1978 letter to the union inviting it to "discuss all aspects" of the closing, "including, but not limited to, the impact that such a closing would have upon employees at the plant." In that letter to the union it said it intended to offer employment to as many Hollins Ferry Road employees as possible at the new plant.

Several meetings between Universal officials and union representatives were held in February, at which meetings the principal bone of contention was the union's request that the company recognize the union voluntarily as the exclusive bargaining representative of the production and maintenance workers at the Owings Mills plant—a request the company consistently denied. Other specific problems were discussed, although no discussions were held on general problems associated with the transfer, such as severance pay and seniority questions. Universal claims that it stood willing to discuss these issues but the union never brought them up, thus waiving its right to complain later.

The Board concluded that these meetings were insufficient to satisfy the company's duty because they came too late for effective bargaining to take place. We believe the Board's conclusion is supported by substantial evidence.

The decision to close Hollins Ferry Road was made on February 2, 1978. The letter to union officials, dated February 3, 1978, stated that it would "probably" be necessary to close the plant "within the next few weeks." Meanwhile, however, the company began to make offers of transfer to the Hollins Ferry Road employees on February 3, 1978 and completed this process in just a few days, well before the first meeting with the union. Following interviews with each employee, Universal's O'Neill asked each employee to sign a form reciting that the employee had been offered a transfer and to fill out whether or not the offer was accepted.

The transfers began almost immediately. At least some of the former Hollins Ferry Road employees gathered at Owings Mills February 8, 1978, where they were told of the different wages and health benefits there, as well as the change in the seniority status for layoffs. This occurred almost a week before the first meeting with union officials.

In short, the mechanics of the transfer were well in motion by February 14, with many of the areas which could be expected to be bargained over—transfers, wages, seniority, etc.—having already been determined unilaterally.

In *N.L.R.B. v. Katz*, 369 U.S. 736, 82 S.Ct. 1107, 8 L.Ed.2d 230 (1962), the employer had instituted several unilateral changes in mandatory bargaining areas while the matters were under negotiation with the union, with some of the changes being more advantageous to employees than those the employer offered the bargaining representative. In that case the Court wrote:

> Unilateral action by an employer without prior discussion with the union does amount to a refusal to negotiate about the affected conditions of employment under negotiation, and must of necessity obstruct the bargaining, contrary to the congressional policy. It will often disclose an unwillingness to agree with the union. It will rarely be justified by any reason of substance.

369 U.S. at 747, 82 S.Ct. at 1114.

The Court went on to say that this type of action was "necessarily inconsistent with a sincere desire to conclude an agreement with the union." 369 U.S. at 745, 82 S.Ct. at 1112.

The Board's policy is that even if the unilateral action is beneficial to the employees the employer is not free to bypass the bargaining representative. *Wellman Indus., Inc.*, 222 NLRB 204 (1976). In that case the Board said that such unilateral action is unlawful because whether or not an offer is beneficial is a matter of opinion, is relative depending upon the employees' alternatives, and places the employer in a position of making choices for employees which are to be made by the bargaining representative. *Id.* at 206.

In light of the sequence of events which occurred even before the first meeting with the union on February 14, it is clear that Universal had unilaterally made choices for its employees which should have been presented to the bargaining representative. The union's position was undercut by the time negotiations began. Universal's actions were clearly contrary to the spirit of the Act and the Board correctly found them to be so.

Universal's claim that by offering employment to the Hollins Ferry Road employees it removed the most central issue from the negotiations misses the point. The Act condemns such unilateral acts. The transfer offers should have been presented to the union to enable the union to negotiate as to the timing and the manner of the transfers, as well as any other effects with which it was concerned.

## IV. UNIVERSAL'S THREATS

The Board's finding that the company's threats of reprisals if Owings Mills employees sought union representation is clearly supported by substantial evidence. Universal, while citing this as error, does not strenuously argue the point.

Universal's O'Neill warned employee Egitto that if the employees attempted to gain union representation at Owings Mills, the working conditions at that plant would deteriorate to the level at Hollins Ferry Road. These same comments were substantially repeated to the group of transferees from Hollins Ferry Road who gathered at the Owings Mills plant on February 8, 1978.

Such conduct violates the spirit of the Act, intimidating employees from exercising their right to organize as guaranteed by § 7 of the Act. *N.L.R.B. v. Renner Plumbing, Heating & Air Conditioning, Inc.*, 437 F.2d 893 (4th Cir. 1971). *N. L. R. B. v. Aerovox Corp. of Myrtle Beach, S. C.*, 435 F.2d 1208 (4th Cir. 1970).

Universal does not challenge this legal conclusion. It does however challenge the factual findings by the ALJ and confirmed by the Board, that the O'Neill/Egitto exchange ever took place. O'Neill denied the exchange when he testified.

The ALJ specifically cited the discrepancies in Egitto's and O'Neill's testimony and where they did conflict the ALJ credited Egitto's. He did so based on demeanor and apparent conflicts between O'Neill's testimony and other evidence.

Universal has presented us with no sufficient reason to disturb this finding by the ALJ. The company's claim that O'Neill's testimony is buttressed by the fact that Egitto's was only one of hundreds of conversations O'Neill had with Hollins Ferry Road employees and no other employee testified to a similar conversation, in no way tends to suggest that that particular conversation did not take place. In fact, it could be said that with that many conversations compressed into a relatively short time, O'Neill might tend to forget the details of each one. Universal also says that there was no evidence that the company in any way mistreated its Hollins Ferry Road employees. However, *there was* evidence—evidence which the company does not dispute—that Hollins Ferry Road was inefficient, cold in the winter, hot in the summer, and overcrowded. While these conditions may not constitute mistreatment, employees transferring to Owings Mills no doubt would prefer more pleasant working conditions.

One of the ALJ's functions is to make factual findings. He did so and his findings are supported by substantial evidence. The fact that he credited one witness over another is no reason to disturb the findings

since it is his job to determine what is fact when presented with a conflict.

## V. THE BACK–PAY AWARD

Universal claims that the portion of the Board's order which requires it to pay back wages to the 29 employees who lost their jobs with the company after declining transfers from Hollins Ferry Road to Owings Mills—which the Board called a "limited" back-pay order—is unwarranted by the facts of the case and punitive in nature.

Before addressing the merits of this issue, however, we must address a procedural matter. The General Counsel for the Board claims that Universal is precluded from challenging this remedy since the company failed to request a reconsideration of the Board's award. It cites the Board's Rules found at 29 CFR § 102.48(d)(1) and (3) for the proposition that a party must move for reconsideration or rehearing when an alleged error arises in the first instance as a result of the Board's decision. Universal having failed to make such a motion, the General Counsel claims the rules bar Universal from objecting on this appeal.

Section 102.48(d)(1) provides:

A party to a proceeding before the Board may, because of extraordinary circumstances, move for reconsideration, rehearing, or reopening of the record as to the Board's decision or order. A motion for reconsideration shall state with particularity the material error claimed. . . .

Section 102.48(d)(3) provides:

The filing and pendency of a motion under this provision shall not operate to stay the effectiveness of the action of the Board unless so ordered. A motion for reconsideration or rehearing need not be filed to exhaust administrative remedies.

The General Counsel cites *International Ladies Garment Workers' Union, Upper South Department, AFL–CIO v. Quality Mfg. Co.*, 420 U.S. 276, 281 n.3, 95 S.Ct. 972, 975 n.3, 43 L.Ed.2d 189 (1975) to support this position. In that case the Supreme Court wrote that § 102.48(d)(1) precluded appeal when the Board adopted a theory not previously charged or litigated. The General Counsel also cited *N. L. R. B. v. Erlich's 814, Inc.*, 577 F.2d 68, 69 n.2 (8th Cir. 1978); *N. L. R. B. v. STR, Inc.*, 549 F.2d 641 (9th Cir. 1977); *N. L. R. B. v. Allied Products Corp.*, 548 F.2d 644, 652–54 (6th Cir. 1977).

We disagree with the General Counsel's position. The cases he cites are cases in which for some reason the Board issued a decision or an order which did not correspond to the issues and facts fully litigated before it. For instance, in the *STR* case, the court wrote at 642: "The complaint gave the Company more than ample notice that the Board would be examining the circumstances of [the] departure." In the *Allied Products Corp.* case the court wrote:

Extraordinary circumstances for these purposes exist only if there has been some occurrence or decision that prevented a matter which should have been presented to the Board from having been presented at the proper time.

548 F.2d at 654.

It appears clear from these and other cases that the Board regulation is designed for cases in which the Board surprises a party with matters which were not fully presented and litigated before the Board. In a case in which the parties have been made aware that an issue would or could be decided by the Board, and the parties have taken the chance to present their sides of the issue to the Board and the Board has issued its decision, the failure to request reconsideration under the regulation does not bar the losing party from citing the issue on appeal.

In issuing its back-pay order, the Board did not catch these parties by surprise. The ALJ had previously ordered the company to pay these 29 employees back wages and the company cited this finding in its exceptions to the ALJ's decision. From the record before us it appears clear that the parties fully litigated this issue and the failure on the part of Universal to move for reconsideration by the Board does not preclude it from citing the Board's order on appeal.

Despite specifically finding that Universal did not act discriminatorily towards these employees, the Board issued its "limited" back-pay award to make the employees whole and "in order to recreate in some practical manner the situation in which the parties' bargaining position is not entirely devoid of economic consequences for [Universal]." While the Board enjoys broad discretion in fashioning remedies, *N. L. R. B. v. Seven-Up Bottling Co.*, 344 U.S. 344, 73 S.Ct. 287, 97 L.Ed. 377 (1953), and a back-pay award "should stand unless [it is] . . . a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act," *Virginia Electric & Power Co. v. N. L. R. B.*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1943), its order must be appropriate " 'and shall be adapted to the situation which calls for redress.' " *N. L. R. B. v. District 50, UMW*, 355 U.S. 453, 78 S.Ct. 386, 2 L.Ed.2d 401 (1958), quoting *N. L. R. B. v. Mackay Radio & Telegraph Co.*, 304 U.S. 333, 348, 58 S.Ct. 904, 912, 82 L.Ed. 1381 (1938). *See also, Local 60, United Brotherhood of Carpenters & Joiners of America, AFL–CIO v. N. L. R. B.*, 365 U.S. 651, 81 S.Ct. 875, 6 L.Ed.2d 1 (1961).

Many of the cases in which the Board has awarded employees back-pay in a partial closing context are cases in which the employees were laid off and given no other employment opportunities by their former employer. *See, e. g., P. B. Mutrie Transportation, Inc.*, 226 NLRB 1325 (1976); *Thompson Transport Co., Inc.*, 184 NLRB 38 (1970); or when the laid off employees were found to have been discriminated against. *Purolator Products, Inc.*, 160 NLRB 80 (1966).

The record in this case discloses that all 29 of these workers were offered transfers to Owings Mills. For reasons of their own, they declined the transfers. After declining, they were put on a preferential hiring list at Potee Street. Furthermore, the Board specifically rejected the ALJ's conclusion that these 29 employees had been unlawfully discriminated against.

Given these facts, we believe a back-pay award is inappropriate in this case. We fully recognize that Universal violated the Act by its failure to bargain over the effects of its closure decision and by offering these transfers unilaterally. However, placing these 29 employees on a preferential hiring list is all that is needed to vindicate the policies of the Act. A back-pay award, in our judgment, is not "adapted to the situation which calls for redress."

We therefore decline to enforce this portion of the Board's order.

## VI. CONCLUSION

For the reasons stated, therefore, we enforce the Board's order except for those portions which require Universal to bargain with the union over its decision to close the Hollins Ferry Road plant and which would require the company to make a back-pay award to the 29 employees laid off after refusing transfers.